FARMERS' LOAN & TRUST CO. v. CENTRAL R. & BANKING CO. OF GEORGIA et al. (GEESLIN, Intervener).

(Circuit Court, S. D. Georgia, W. D.    May 22, 1895.)

1. RECEIVERS (§ 110*)—DUTY OF COURT—PROTECTION OF RAILROAD EMPLOYÉS.

When the owners of a railroad seek the assistance of a court for the protection of their property through the appointment of a receiver, it is the duty of the court, pending the receivership, to do justice to every honest employé connected with the properties, and to prevent, if need be by peremptory judicial orders, oppression, injustice, and wrong even to the humblest. This is especially true where the receiver has often invoked and obtained similar action to protect the properties from injury on the part of employés.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 195; Dec. Dig. § 110.*]

2. RECEIVERS (§ 116*)—DUTY OF COURT—PROTECTION OF RAILROAD EMPLOYÉS.

Where a railroad conductor of blameless character, who had compromised a suit against the railroad for injuries he had sustained in attempting to save the life of a passenger, and, in consideration of such compromise, had a written agreement with the road that he should be permanently retained in his position as conductor, is charged, upon the unsupported testimony of detectives of doubtful credibility, with the gravest criminal offense, and without a chance to defend himself is peremptorily thrown out of his position and means of livelihood by the receivers, it is in the discretion of the court, and its duty, to order that his office be restored to him.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 203; Dec. Dig. § 116.*]

(Syllabus by the Court.)

In Equity.

Robert Weston Patterson, for intervener.

Lawton & Cunningham and Marion Erwin, for Central R. & Banking Co. of Georgia.

SPEER, District Judge. The receivers of the Central Railroad & Banking Company of Georgia appointed by this court had discharged W. F. Geeslin, a conductor, upon charges of unfaithfulness, irregularity, and larceny of his fare collections. Geeslin, protesting his innocence, appealed to the court by intervention to have his injuries redressed. The intervention was filed in the suit in which the receivers were appointed. It recited that he had been in the employ of the company for nearly 30 years; that on the ——— day of ——— he had been desperately injured while attempting to save the life of a passenger in a wreck caused by the negligence of the railroad company; that from these injuries he still suffers, and is compelled to wear a band and trusses about his abdomen. He sued the company for the injury thus sustained. Thereafter, by written agreement with the general manager, the suit was dismissed, one of the conditions being that Geeslin should be permanently retained in his position as conductor.

This is the language of the proposition in writing submitted by Gees-lin to Cecil Gabbett, general manager:

"I will dismiss the case upon the condition that you pay me the sum of $250.00 and all court costs, and that the company restore me to the same position and work in the service of the company that I held at the time of my discharge from its service, allowing me to continue in that service and for the like compensation, so long as I am able to do the work, and upon the distinct understanding that I am not to be discharged from that service except upon good cause, notice of which and a hearing shall be given me before my discharge. The company acting and to act towards me in good faith as I on my part will act to it, rendering faithful service to the best of my ability."

This offer of the conductor was formally accepted by Cecil Gabbett, general manager as aforesaid. The date of this agreement was February 3, 1890. After the receivers were appointed, on the 2d day of December, 1893, Geeslin received this notification:

"You are dismissed from the service of this company on account of unsatisfactory services."

It will thus be seen that he had no hearing or notice of the charges against him. When the rule against the receivers to show cause why the relief sought by Geeslin should not be granted issued, they answered that it had been brought to the attention of the officers operating the Central Railroad & Banking Company of Georgia that Geeslin had been running his train in an improper manner, and not returning to the railroad company the amounts which he had received from passengers for fares, and that on two occasions detectives were put upon his train, and the reports made by the detectives showed, as compared with the reports made by Geeslin, that he was not returning the fares; that he was in the habit of collecting money and not returning it; that he was in the habit of transporting a large number of persons on his train, without requiring payment from them for fares; and for these reasons he was discharged. The court requiring the receivers to answer the rule more specifically, by amendment they charged that Richard Burden, Oscar Clyett, T. A. Frierson, Enoch Garrett, P. B. Barfield, Mattie Miller, Sam T. Sams, Mollie Wyley, Susie Lowe, Sara Persons, Dora McDonald, and Mandy Shearly were passed by Geeslin over the railroad without paying any fares whatever; that, further, Geeslin was in the habit of carrying fruit, vegetables, game, etc., over the Central Railroad without paying any freight for it.

The hearing of the evidence extended over many days, and was very careful and thorough. Every person whom Geeslin was accused of carrying over the road without paying fare was summoned as a witness in behalf of the receivers, and with one exception they testified positively that the charge was wholly untrue; that Geeslin had always collected their fares, either in cash or by giving a ticket. Geeslin frankly admitted that on more than one occasion he had carried Capt. Frierson, who had been badly injured in the same accident on the road when he himself was hurt, and he did it upon the understanding that Frierson would not bring suit against the road. In recognition of this, an annual pass for one year was given Frierson by the manager. Frierson testified to the same thing. Miss Miller testified that on two occasions

she had been carried from Bostick to Geneva by Capt. Geeslin, who did not collect any fare from her, but she also testified that the stations were but five miles apart, that she had no money when she got on the train, that Geeslin did not know this, and, further, that, if the conductor had put her off, she would have been left unprotected between the stations.

It appeared from the evidence that Geeslin had been given permission, on account of a service he had rendered to the Southern Express Company, to transport in the car of that company, without expense to him, such small articles of freight as were mentioned in the evidence. Occasionally these things, it is true, were placed in the baggage car, but it also appeared from the testimony that a large proportion of this produce of various kinds was intended for certain superior officers of the company, which was either delivered to them in Macon or was forwarded on their franks to Savannah. An examination of the final reports audited of the train earnings of Geeslin based upon data of two months, October and November of 1893, which were the only reliable data in the records of the receivership, showed that, taking the cash and ticket collections together, Geeslin averaged $9.25 per diem more than the conductor running the opposing train. The testimony as to his high character as a man and conductor was overwhelming. No man ever produced a superior array of witnesses in court to support his character, and no testimony was ever more uniform and strongly encomiastic than that offered in behalf of this man. Ministers of the gospel, bankers, merchants, commercial travelers, representatives almost of every class of the community, spoke most warmly and enthusiastically in his favor. It was shown that he was one of the most popular conductors on the road. The only evidence in the entire record which tended in the slightest degree to incriminate what seems to be this faithful and excellent servant was the testimony of three detectives from "Field's Detective Agency of St. Louis." One of these was a negro from that city, whose testimony was contradicted in material particulars by several witnesses. The others admitted that they were at some distance from Geeslin in the car while he was collecting fares, and they testified to what seemed to them to be cash transactions between him and passengers, which it appeared he did not report, and which led them to the conclusion he was appropriating the collection to his own use. The names of no witnesses to these transactions were obtained. Geeslin denied utterly the truth of the charge, and all that the detective saw was that the passenger and the conductor were handling coin. This circumstance, viewed under the familiar rule relating to circumstantial evidence, could not be regarded as incriminatory. How reasonable is the theory, consistent with the innocence of the conductor, that the passenger was either giving him change for a bill, or that he was giving the passenger change, a transaction of everyday occurrence between conductors and passengers. On the written report of these detectives to the detective agency in St. Louis, this faithful servant, to whom the Central Railroad was under the highest moral, if not legal, obligation, was discharged without the opportunity of making his defense. All of the evidence, outside of the testimony of the detectives, shows that this man was exceptionally faithful and effective in every

duty imposed upon him, and the court so held, after the most careful and anxious consideration of the entire case and most elaborate arguments of counsel.

Now, the receivers appointed by the court present a petition to be allowed to appeal from the decision, upon the ground that:

"In their opinion, the, carrying out of said judgment will have a serious effect upon the discipline of the various agents employed by them in the administration of their trust, and that the establishment of said decree as a precedent in the administration of the property will deprive these petitioners and officers under them of that control over the personnel and discipline of their employés which, in the opinion of petitioners, is important, if not absolutely essential, to the proper conduct of the business intrusted to them."

Petitioners further represent:

"That they have a personal interest in the selection of employés to operate the property for whose management they are responsible to the court, and, while it is true that the property is in the hands of the receivers under the administration of the court, it is nevertheless true that the receivers appointed by the court are the agents and managers of that property."

In other words, the receivers would deny to the court the right and privilege to redress the wrong of a conductor, employed by them under its authority, who was most unjustly and unadvisedly charged with the gravest criminal offense, and, without a chance to defend himself, peremptorily thrown out of his office and means of livelihood, upon the hearsay reports of detectives, which, on examination, did not amount to the slightest probable cause for the accusation, and upon which any committing magistrate would have refused to hold the intervener for trial, a charge, too, which deprived him of the employment guaranteed by the solemn contract of the railroad itself upon a consideration both valuable and meritorious, and a charge, too, which would have deprived him of employment elsewhere, and, after an honorable life devoted to the service of the company, would in his old age have cast him out ruined and helpless.

The court refuses utterly to give sanction to this view of the receivers. When the owners of a railroad seek the assistance of the courts of the country for its protection, by every fair implication they invoke their action not only to protect the property, but to do justice to every honest employé connected with it, and to prevent, if need be, by peremptory judicial orders, oppression, injustice, and wrong, even to the humblest employé. To hold otherwise would be contrary to principles heretofore established, upon the application of the receivers themselves against the employés of the company.

The court has been prompt to protect the property, as it has and will be prompt to protect the employés from wrong and injustice of any character. Instead of militating "against the effective operation of the properties and the discipline of the various agents employed by the receivers," the action of the court will have the opposite effect. It will at once advise the receivers that their hasty and unjustifiable action will be corrected, and will guarantee to the employés that while they do their duty they cannot be arbitrarily discharged upon unsupported accusations of crime.

The receivers are therefore advised that in the opinion of the court there are no reasons of law or fact connected with the operation of the railroad property which make it necessary for them to have the power to arbitrarily destroy the good character of an innocent man, and to deny to him that appeal to the court having jurisdiction of the appointment of the receivers themselves, and of all appropriate matters of management of the properties, which right is guaranteed to the citizen by the character of our institutions and the benignity of our laws. The matter being in the discretion of the court, as frankly conceded by receivers' counsel, the court will have the temerity, on this occasion at least, to exercise that discretion, and to venture to differ with the receivers as to the propriety of its judicial action, and accordingly will decline the leave to appeal sought by them.